IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No. 05-cv-00601-WYD-MJW

JOSHUA BRUDWICK, and
KATHRYN RHODES,

     Plaintiffs,

v.

JOHN G. MINOR, SUMMIT COUNTY SHERIFF, and
BOARD OF COUNTY COMMISSIONERS OF SUMMIT COUNTY, and
THOMAS WICKMAN, CHIEF OF FRISCO POLICE DEPARTMENT, and
TOWN OF FRISCO, and
DEREK WOODMAN, and
CALE OSBORN, and
MARK HEMINGHOUS, and

     Defendants.

_____

### ORDER GRANTING SUMMARY JUDGMENT
_____

I.    <u>INTRODUCTION</u>

     THIS MATTER is before the Court on Defendants' Motions for Summary

Judgment filed on February 6, 2006.  Defendants assert that summary judgment is

proper on Plaintiffs' illegal search and detention claims asserted pursuant to 42 U.S.C.

§ 1983 based on the doctrine of qualified immunity for the individual Defendants and on

Plaintiffs' inability to prove municipal liability against the entities.  Defendants also

assert that Plaintiffs' state law claims fail for a variety of reasons.  A hearing was held

on these motions on Monday, June 19, 2006.

For the reasons stated below, Defendants' Motions for Summary Judgment are GRANTED.  The trial set to commence June 4, 2007, and the final trial preparation conference set May 25, 2006, are vacated.

II.    FACTUAL BACKGROUND

Plaintiffs allege violations of their rights under the Fourth Amendment to be free from unreasonable searches and seizures.  The claims relate to the execution of a search warrant by the Summit County Drug Task Force and Summit County SWAT Team on the morning of July 25, 2004.  Plaintiffs' residence and garage were searched.  The involved agencies, which included the Summit County Sheriff's Department and the Frisco Police Department, obtained the warrant to search for a suspected clandestine methamphetamine lab.

Defendants have admitted, for purposes of their Motions, Plaintiffs' testimony.  Viewing the facts viewed in the light most favorable to Plaintiffs, as I must for purposes of Defendants' motions, Plaintiffs resided at 906 Meadow Creek Drive, unit 108, in Frisco, Colorado until September 2004.  The property manager, David Tubbs and his wife Carla, lived in the unit above the Plaintiffs.

In March or April of 2004, the Tubbs began noticing unusual odors which they perceived to be emanating from Plaintiffs' unit and drifting directly upstairs into their unit.[1]  The odors were reported to occur late at night, typically between 11:00 p.m. and

---

[1]  Plaintiffs dispute the fact that there was actually an odor, but present no evidence to refute the evidence of Defendants on this point.  Accordingly, Plaintiffs did not meet their burden in showing that this fact was disputed.  Further, regardless of whether there was in, in fact, an odor, the evidence is undisputed that the Tubbs reported an odor to police on numerous occasions.  *See* ¶ 5, Defs.' Joint Reply Concerning Undisputed Facts and Response Concerning Undisputed Facts.

5:00 a.m., and to last about 15 minutes before dissipating.  The Tubbs described the odors as powerful, acrid and smelling like "chemicals".  The Tubbs reported that the odors woke them up from a deep sleep and caused a burning sensation in the backs of their throats.

In May of 2004, Carla Tubbs called Frisco Police the morning after a night when the Tubbs smelled the odor.  Carla Tubbs told police about a strong odor that burned her throat.  Mr. Tubbs called police three or four times over the next several months to report odors, although they did not report an odor every time they smelled one, purportedly because his wife was afraid.  The Town's Computer Assisted Dispatch ["CAD"] reports show calls were made on May 21, June 7 and July 1, 2004.  On each occasion there were odor or "chemical smell" complaints that were attributed to the Plaintiffs.

Officers were apparently dispatched in response to these calls but it is unclear whether anything was done.  Mr. Tubbs recalled making a call on or about May 21, 2004, and believed that a police officer responded to Plaintiffs' unit, knocked the door, and left when no one came to the door.  However, Plaintiffs deny that the police contacted them on those occasions or knocked on their door, and assert that they knew nothing about these complaints.  Plaintiffs further assert that the only documentation of these incidents is four computer printouts which indicate a dispatch of an officer, with no accompanying reports or other documentation.  It is also contended by Plaintiffs that the Tubbs did not like the fact that Plaintiffs were cohabitating as a married couple and had singled them out in the past for transgressions.

It is undisputed, however, that on July 1, 2004, Sergeant Tina White ["Sergeant White"] was dispatched to Plaintiffs' unit after a complaint that "tenant Josh smoking 'something stronger than marijuana'" (quotation omitted).  On this occasion, Sergeant White went to Plaintiffs' door in the early morning hours, woke them from sleeping, and explained that an anonymous person had called and said Plaintiffs were using drugs other than tobacco or marijuana.  Plaintiffs denied using drugs.  Sergeant White asked Plaintiffs if they had any "enemies" who would have called the police on them.  Sergeant White then left, after having found nothing unusual.  Plaintiffs have no complaints about Sergeant White's conduct that night.

Mr. Tubbs recalls that Sergeant White was dispatched after he made an odor complaint, and that the odor had dissipated by the time she arrived.  He recalls hearing toilets flushing and water running in the Plaintiffs' unit after Sergeant White knocked on the door.  Sergeant Mark Heminghous ["Heminghous"] of the Frisco Police Department spoke to Sergeant White sometime after her contact with Plaintiffs and recalls only that she did not smell anything unusual.

Heminghous had other contacts with the Tubbs.  He and Agent Cale Osborn ["Osborn"] responded to the Tubbs' unit and sat in their bedroom on a night when the Tubbs had complained of smelling an odor, but could detect none.  Heminghous also later ran a criminal history check on the Plaintiffs using information provided by David Tubbs.  That check came back negative.  No other investigation was done by Heminghous at that time.

In the early morning hours of July 25, 2004, David Tubbs called the police. Summit County Deputy Sharon Ruszczyk ["Ruszczyk"] and Sergeant Bryon Colvin ["Colvin"] were dispatched and went to the Tubbs' unit.  The Tubbs told the deputies that they were upset because they had been awakened several times in the middle of the night by an odor that they linked to Plaintiffs' unit.  Mr. Tubbs reported that they began noticing the odor in March of 2004, and it would be accompanied by a burning in their throats and nausea.  Mr Tubbs reported that this had occurred at least ten times, and that they called police four times.  He further told Colvin that after Sergeant White went to Plaintiffs' door, he could hear toilets flushing and water running.  David Tubbs said that he and his wife wanted their "lives back" and were concerned for their safety. While in the Tubbs' unit, neither officer smelled the odor, but both felt a burning in their throats and Ruszczyk felt "light-headed".  Neither officer received medical treatment, and Ruszczyk said she felt better after she left the Tubbs' unit.

A short time later, Frisco Police Officer Neil Baker ["Baker"] arrived.  Colvin and Ruszczyk told Baker what David Tubbs had told them.  Colvin felt the Tubbs were credible.  Colvin then contacted Osborn, a Summit County Sheriff's Deputy, who was the lead officer with the Summit County Drug Task Force ["SCDTF"[.  Baker contacted Heminghous.  Osborn and Heminghous both had training on investigating methamphetamine labs, although Plaintiffs assert that the training was not adequate.

Osborn responded to the scene of this possible "drugs call."  After he arrived, Colvin told him that the Tubbs were complaining about a "pungent, chemical foul odor".  Colvin explained that David Tubbs said that they had smelled this odor on and off since

March and that it made them so "nauseated" and "sick" that they had to move their bedroom.  Colvin also informed Osborn that even though he was inside the Tubbs' unit for only a few minutes, he and Ruszczyk experienced irritation in the backs of their throats.  Osborn prepared a report describing what he learned.  Heminghous arrived a short time later and as Heminghous and Osborn were approaching the condominium complex, they reported detecting a brief chemical odor consistent with a methamphetamine lab.[2]

Osborn, Heminghous and Baker then went to the Tubbs' unit.  Baker proceeded no further than the threshold, but recalls experiencing slight discomfort in his throat at that time.  David Tubbs told Osborn and Heminghous that the odor had been coming and going during the early morning hours since March of 2004, that the smell was usually accompanied by noise from Plaintiffs' unit, and that the Tubbs had smelled the odors ten times since March of 2004 and called the police on four occasions.  On one occasion, after Sergeant White left, the Tubbs could hear toilets flushing and water running in the Plaintiffs' unit for an extended period of time.  David Tubbs told the officers that Plaintiffs tried to avoid contact with him because he was the manager.  He explained that he and his wife were "tired of being sick" and wanted their "lives back".  Neither Heminghous nor Osborn smelled an odor inside the Tubbs' unit.

The Tubbs also filled out written statements describing the history of problems and concerns about Plaintiffs, including the fact that there was a lot of "traffic" in and

---

[2]  While Plaintiffs admit that this report was made, they challenge the accuracy of the report, without citation to any evidence in the record.  This unsupported challenge by Plaintiff is thus disregarded.

out of Plaintiffs' unit and back and forth from Plaintiffs' garage, that Plaintiff Brudwick seemed to have changed and become more withdrawn, and that the males who stayed in the Plaintiffs' unit avoided contact with David Tubbs and would not "look you in the eyes". Carla Tubbs wrote in her statement that the odor was typically detected when the Plaintiffs were up late, between midnight and 4:00 a.m. and that the Plaintiffs "were always up and making noise when I smelled the odor during all hours of the night". David Tubbs reported that the odor was so strong that it woke the Tubbs up from their sleep, that they had observed a number of visitors coming and going, and that he and his wife were fearful of what kind of activities might be taking place in Unit 108.

Osborn concluded, based on his training and experience, that the symptoms of the people on the scene and the acrid, burning odors were caused by a methamphetamine lab. Gases commonly produced during the methamphetamine manufacturing process are very dangerous and can be hazardous to the health. Symptoms of exposure include shortness of breath, chest tightness, headache, vertigo, nausea, vomiting and death, and the gases can cause respiratory irritation and impairment along with other impairments.[3]

Osborn and Heminghous discussed what to do and, given the history of the complaints, the corroboration by Colvin and Ruszczyk and the risks involved, apparently decided that they should pursue a warrant. This was despite the fact that no officer ever smelled an odor emanating from Plaintiffs' unit or the Tubbs' unit.

_____

[3] Plaintiffs deny the allegations in this paragraph, but cite to no specific evidence to support their denial. Instead, they make legal arguments which are improper in connection with the facts. Accordingly, I have accepted Defendants' allegations in this paragraph.

At about 4:00 a.m., Osborn called Karen Romeo ["Romeo"], an Assistant District Attorney for the Fifth Judicial District.  Romeo had, prior to that date, reviewed over one hundred search warrants in her prosecuting career and testified in discovery that she serves as an important check on the issuance of warrants and understands the importance of her obligation to independently review affidavits for search warrants.[4] Osborn explained, by telephone, what the officers had learned.

There is some dispute as to what was specifically said.  Plaintiffs contend that Osborn misled Romeo into believing that the officers actually smelled the odor and that they became nauseous.  Specifically, Plaintiffs assert that Romeo testified in her deposition, "I remember the main thing that stuck in my mind is that two officers entered the unit, and immediately became nauseous and sick."  Romeo's recollection in her deposition is that Colvin, Ruszczyk and Tubbs actually smelled the odor, that Heminghous did not smell it, and that Osborn either did not smell it or it was very faint.

Plaintiffs further contend in one section of their pleadings that Osborn omitted the fact that no corroborating evidence was found at the time of the four previous complaints.  Plaintiffs later, however, admit in their own statement of facts that Romeo *was* told about the previous complaints concerning suspicious drug activity and that officers on prior occasions never smelled anything.  Thus, this fact appears not to be disputed.  Finally, Plaintiffs assert that Osborn omitted the fact that on at least one

---

[4]  Plaintiffs neither admitted nor denied the statements in this sentence.  Since no evidence was cited by Plaintiffs that disputes these statements, I will accept them as true for purposes of the motions. I have also accepted other facts in this Order which were supported by evidence from Defendants and which were neither admitted nor denied by Plaintiffs.  As to such facts, Plaintiffs also cited no evidence to support a denial of the facts.

occasion, Plaintiffs had been contacted by the police who observed no evidence of illegal activity.

Romeo concluded that there was probable cause to pursue a search warrant, even despite being told that officers on prior occasions had not smelled the odor. Romeo also believed the situation was potentially dangerous, was an urgent matter, and that it was essential that the officers get and execute the warrant.[5]  Osborn then prepared the warrant and an affidavit in support of search warrant.  Both Osborn and Heminghous testified that they relied on Romeo and that had Romeo told them that they lacked probable cause or that the officers needed to do additional investigation, they would have followed Romeo's directive.[6]

Osborn's affidavit stated that Colvin told him the following: that he responded to Unit 208 on a potential drugs call; that David Tubbs called the police because of a suspicious odor coming from unit 108, that Colvin and Ruszczyk went to the Tubbs' unit, and while therein, both officers because nauseated and felt irritation in the backs of their throats; and that Colvin advised the Tubbs that he was going to contact a drug agent.  Osborn's affidavit also stated that Colvin told Osborn that the Tubbs claimed that they had experienced nausea and a burning sensation in their eyes, resulting from a chemical smell, prompting the Tubbs to move their bedroom.  The affidavit also stated that as Osborn and Heminghous approached the building, they detected a slight

---

[5]  This fact was neither specifically admitted nor denied by Plaintiffs, and I will thus assume it is true for purposes of the motions.

[6]  Plaintiff denies that Heminghous talked to Romeo, but presents no evidence to counter his testimony that he relied on her statements about probable cause made to Osborn.

chemical odor in the air.  Osborn further stated that David Tubbs told the officers: that

the smell had been coming and going since March of 2004; that he believed Plaintiffs

were "up to something"; that Plaintiffs often stayed awake into the early morning hours,

and that when they did, the Tubbs would notice the smell; that he had smelled the odor

about ten times and called police four times; that on one of those occasions, the Tubbs

heard the toilet flushing and water running for an extended period of time; that the

Tubbs were fearful; and that Plaintiffs tried to avoid him and appeared disheveled.

Summit County Court Judge Edward Casias issued the search warrant at

approximately 7:00 a.m., on July 25, 2004.  That warrant permitted the officers to

search for evidence of methamphetamine manufacturing and distribution in Plaintiffs'

condominium unit and garage.

After getting the warrant, the Summit County SWAT team had a planning

meeting at about 8:00 a.m. at the Frisco police station.  Osborn, Heminghous and

Summit County Undersheriff Derek Woodman ["Woodman"], the commander of the

SCDTF, all participated.  The mechanics of executing the warrant were planned and

discussed.  Because of the risks attendant to such a search, those executing the

warrant were to wear chemical suits and breathing apparatus, a Hazmat team was to

be called, and a decontamination area would be planned.

While Osborn and Heminghous were pursing the warrant, Baker was assigned

to sit in his vehicle near Plaintiffs' condominium complex.  At about 10:00 a.m. all

search team personnel were assembled in anticipation of executing the warrant.  At the

time the search team began to move out, Baker radioed to the command post that he

-10-

had spotted the Plaintiffs leaving their unit in their vehicle.  Woodman directed Baker to

stop Plaintiffs and detain them.  Woodman testified that his directive was based on the

warrant, suspicion that the Plaintiffs had been producing methamphetamine and

concern for public health and safety.  Baker, accompanied by two Summit County

deputies, pulled over Plaintiffs' vehicle in the parking lot of a restaurant about three

blocks from Plaintiffs' residence.

Brudwick does not know who pulled Plaintiffs over.  Rhodes asserts that it was

Baker who came to the window of the vehicle and asked if they were "Josh and Kate",

and that Plaintiffs responded in the affirmative.  Rhodes recalls that they gave Baker

their driver's licenses and that Baker said, "Your car is now property of the Frisco

Police Department and you are not allowed to leave the vehicle."  Rhodes recalls that

when Plaintiffs asked Baker why they were being detained, he indicated he could not

discuss it.  Plaintiff Rhodes characterized Baker's demeanor as "professional".

Rhodes recalls that Officer Baker was joined by three unidentified officers from

an unknown jurisdiction.  Two officers then stood on each side of the car.  Rhodes

reached for her cell phone and began to call her father when an unidentified officer --

not Baker -- reached through the window, grabbed the cell phone, told her she was not

allowed to make a phone call, turned off the cell phone and kept it.  Rhodes later found

the phone in her car.  Rhodes did not ask for permission before making the call.

Brudwick claimed that he and Rhodes may have asked a couple of times what was

happening, while Rhodes claims that she and Brudwick asked the officers that question

about ten times, but were never given an answer.  At some point, an officer other than

Baker asked Brudwick how to get into the garage, and Brudwick provided the officer with a code.  Rhodes testified that she assumed the officers were professional throughout this process, as their demeanor was all business.

Baker was later instructed by Woodman to take Plaintiffs out of their vehicle. Baker understood that he was asked to do so to avoid leaving the Plaintiffs in a confined, enclosed space, which might exacerbate health problems from contamination on their clothes.  Brudwick claims that an unidentified officer told him that police had "found stuff" in Plaintiffs' unit and asked Brudwick to get out of the vehicle and put his hands behind his back.  At that point, Brudwick volunteered that he had a small amount of marijuana in his unit.  The officer did not respond.  Both Plaintiffs were placed in flex cuffs and sat on the curb in front of the restaurant.  Rhodes was hysterical and crying, and testified that she threw up.

After Plaintiffs sat on the curb for between 15 to 45 minutes[7], Baker was directed by Woodman to walk Plaintiffs over to the area where the search was being conducted. Defendants contend that this instruction came from Woodman, which was done in an effort to avoid potential contamination by transporting Plaintiffs in a small, enclosed vehicle.  Plaintiffs were helped to their feet, walked three blocks back to their unit, and delivered to Frisco Detective Mark White ["Detective White"].  Plaintiffs contend that they were subject to threats, intimidation and harassment, although the evidence does not support anything other than what is recited in this Order.

---

[7]  Plaintiffs contend it was 30-45 minutes, Defendants contend it was 15 minutes.

Plaintiffs were separated and Brudwick was walked some distance away. Rhodes stayed with Detective White, still upset and crying. Rhodes claims that for the first ten minutes she was with Detective White, he was "gruff, asking her a series of accusatory questions". Detective White never touched Rhodes, used profanity or drew his weapon. Detective White asked Rhodes what Brudwick was "doing", indicating that police did not think Rhodes was involved, but wanted to know if Brudwick had done anything illegal.

Despite his questioning, Rhodes testified that she was thankful that Detective White was with her, because she did not want to be alone. After about ten minutes, Rhodes recalls that Detective White was led away to talk to some other SWAT officers, and then returned. Rhodes was relieved when he returned. Detective White immediately removed her handcuffs, had another officer bring her water, began apologizing and even rubbed her shoulders. Detective White told Rhodes that there had been odor complaints received from the upstairs neighbor and asked her about what she had smelled and whether she had been sick recently. Rhodes described Detective White as "nice, very comforting, very sweet". Detective White said he would take pictures of any damage and that Plaintiffs would be compensated for any losses.

At around 10:00 a.m., about the time Plaintiffs were first detained, the search began. Colvin was the first to enter. He knocked on the outer door, and finding it unlocked, opened it and proceeded in. Because the search team found themselves in an enclosed space with only one exit, doors at the end of the breezeway were forced open. The unit was secured in five minutes or less. During the search, some doors

-13-

and a mirror were broken, and Plaintiffs claim that Defendants "ransacked" the

premises  The search team did not find any methamphetamine in the unit, but did find a

small amount of marijuana.  The marijuana was left and no charges were filed.

Osborn and Heminghous were also among the agents who participated in the

search, which lasted about 15 to 20 minutes.[8]  Nothing was seized in the unit.  While

searching the unit, officers noticed streaks on the walls throughout the unit that made it

appear as though the walls had been wiped down, which would be consistent with

someone trying to remove the residue from methamphetamine manufacturing.  Plaintiffs

say that the white marks, which are documented in the photographs in this case, were

the result of an effort to touch up the paint.

Officers also searched a garage shared by Plaintiffs and another resident of the

complex.  Before entering the garage, Woodman radioed Baker to get the combination

so that the officers would not have to break down the door.  White, standing some

distance from the garage, felt burning and itching in the throat and eyes shortly after

the garage was opened.  While in the garage, Osborn and Heminghous tested bags of

clothing, which showed a "high" reading for combustibles.  A microwave was also

tested, with the initial test coming up positive for methamphetamine, but a second test

for methamphetamine came back inconclusive. [9]

---

[8]  Plaintiffs dispute this fact, contending that the search lasted about 2 to 2 and ½ hours.
However, Plaintiffs cite no specific evidence in support of this contention.  Accordingly, I have not
accepted that fact as true.  Even if I were, however, to accept Plaintiffs' version, this would not impact
my analysis.

[9]  Plaintiffs dispute the fact that testing was done, but refer to no specific evidence to refute
Defendants' evidence on this point.

After the search was completed and Plaintiffs were released, Detective White escorted them to their unit.  At that time, Plaintiffs learned that their two dogs had run out of the unit when the police came in.  Detective White and another officer radioed for animal control to assist in finding the dogs, which were later retrieved by friends of the Plaintiffs.  Detective White showed Plaintiffs photographs he had taken of their unit using a digital camera, and asked them if they wanted him to photograph anything else. Detective White apologized repeatedly and appeared to Plaintiffs to be "sincere". Before he left, Detective White told Plaintiffs that the police would "take care of it".  He even offered to pay for therapy for Rhodes.  Detective White gave Rhodes his business card with Woodman's name on the back and instructed Plaintiffs to contact Woodman about compensation.

Frisco Police Chief Tom Wickman did not participate in any of these events.  He first became aware of the events on July 5, 2004 at approximately 8:00 a.m. when he learned there was a search warrant.  He asked Heminghous if he had sufficient manpower, to which Heminghous responded in the affirmative.  Wickman relied on Heminghous' belief that there was probable cause.  Wickman had no role in the planning of the raid or the execution of the warrant.

Woodman was the "on-scene commander" at the scene of the search, and participated in the "plan", but did not appear to participate in the search.  He did, however, go into Plaintiffs' unit after it was completed.  Woodman had no contact with Plaintiffs.  John Minor is the Summit County Sheriff.  He had no role in the search of Plaintiffs' unit or in Plaintiffs' detention, was not at the scene, and learned of the

incident after the fact.  Neither Osborn nor Heminghous had any involvement in the

detention of the Plaintiffs.  However, Plaintiffs assert that Osborn's deceptive

statements in the affidavit led to the detention.

Shortly after the incident, Brudwick's father contacted a reporter with the Summit

Daily News about the incident.  Plaintiffs invited the reporter to interview them and

agreed to allow photographs to be taken, which ended up being part of a cover story.

Plaintiffs testified that they wanted the public to know what had happened because they

felt it was important that this not happen again.  However, it is asserted that Plaintiffs

never sought the publicity.  Plaintiffs spoke to the reporter, expecting that the police

would also provide information to the newspaper.  Plaintiffs recognized and believed it

was important to find out the authorities' position on what had occurred.

In written discovery, Plaintiffs identified each statement upon which they were

basing their defamation, libel and slander claims.  Plaintiffs' responses were identical

and were limited to three newspaper articles and a radio program.  Plaintiffs complain

about the following excerpts from the July 27, 2004, cover story in the Summit Daily

News entitled "Meth Raid Yields Nothing":

> "The Summit county Drug Task Force raided a Meadowbrook Villas II
> condominium Sunday morning, believing it would find a meth lab.  It left
> empty-handed but with Sheriff John Minor and Frisco Police Chief Tom
> Wickman saying police are still suspicious, but apologetic and willing to
> pay for damages caused by the raid."

> "Police came to suspect the two were manufacturing crystal
> methamphetamine, a drug whose production process can be extremely
> odorous - and explosive, the three top police officers said in a joint
> interview Monday."

"Nine tips later, four of which were confirmed by police, two of whom became ill after checking the Brudwick-Rhodes unit 2:30 a.m. Sunday - the sheriff's office obtained a search warrant."

"They tested bags of clothing found in the garage that proved positive for hydrocarbons, which range from something as innocuous as gasoline to something as toxic as phosgene gas, the explosive byproduct of crystal meth production, police said."

"They took swabs of a microwave that tested positive for hydrocarbons on a broad scale, but not so on a narrowly defined scale."

Plaintiffs also complain about the following excerpt from an article on July 28, 2004, entitled "Police Pay for Damages":

"[Sheriff] Minor said Monday he would personally deliver the check and apologize to the couple - even though he remained suspicious because all the clues were there, but they weren't able to find any drugs or paraphernalia."

Minor, Woodman and Wickman appeared on a local radio talk show on July 28, 2004.  Plaintiffs' allegation to that appearance is as follows:

"They [the officers] continued to cast a cloak of suspicion on us, despite the lack of any evidence.  [Sheriff] Minor said that they found "less than a joint" of marijuana and that they could have arrested us for that."

Plaintiffs also complained about an October 6, 2004, article, entitled "Case Closed", saying that Minor did not do enough to "exonerate them in the article".  The quote Plaintiffs complain about from the newspaper article is as follows:

"That effectively closes our investigation on that case," Woodman said. "We don't have the evidence to prosecute them."

In briefing the Motions, Plaintiffs have identified additional quotes said to be the basis for their defamation claims.  Turning back to the July 27, 2004, newspaper article, Plaintiffs complain about the following:

-17-

"The complaints, the running water [reported by the complainant], the unusual wiping of the walls, two officers getting sick, four officer verifying the odor, the smell, the odd behavior – somethings' not right," Minor said.

"There are a lot of unexplained things here.  The only plausible explanation is we believe there was probably a meth lab in there.  All the indicators were there, but the products were not.  We got burned, and we paid the price."

*     *     *

Minor said he wouldn't hesitate to conduct such an operation again, if necessary.  "It's a public safety issue," he said.  "Imagine if we didn't execute the search warrant and that place blew up.  You'd hang us out to dry, and you'd have every right to do so."

*     *     *

"We have to take all precaution for the publics' safety", Wickman said.  "If it happened again, we'd do it again.  We don't have the choice."

Plaintiffs also complain about the following from the August 3, 2004, Summit Daily News story entitled "Couple Waiting Apology":

"The Sheriffs' Office is still waiting for test results taken from the scene, notably those in the garage where the officers said it smelled of a flammable solution."

Plaintiff Brudwick testified that it was not what the Defendants "said," but "what they did to us."  Specifically, "the fact that even after -- even after the fact that this all happened they still said there was suspicion."  Plaintiffs have testified that they are not aware of anyone whose opinion of them was changed by any of the media coverage.

Following the execution of the search warrant, the owner of Plaintiffs' unit submitted bills to the SCDTF for reimbursement.  The SCDTF reimbursed $3,060.82 for damage to the unit, which was repaired.  The evidence does not show that Plaintiffs personally ever contacted the SCDTF about reimbursement, although Plaintiffs'

attorney submitted a Notice of Claim letter to authorities which contained a demand for $300,000. It appears that Defendants did not respond to this notice.

In early October of 2004, the SCDTF had agents from the North Metro Drug Task Force run air sampling tests in the Tubbs' unit to see if there was any evidence of methamphetamine. The SCDTF preferred to run the tests sooner but it could not be arranged. The tests were negative. Following that testing, Minor, Woodman and Wickman sent Plaintiffs a written letter stating that it was "our apology to you for the inconvenience imposed upon you and your residence on July 29, 2004."[10]

III.   PLAINTIFFS' CLAIMS

At the time Defendants' Motions were filed, Plaintiffs were asserting the following claims against the following Defendants:

First Claim for Relief pursuant to §§ 1983 and 1985(3) for various search and seizure violations asserted against Minor, Woodman, Colvin, Osborn, the Board of County Commissioners of Summit County ["the Board"], Wickman, Heminghous and the Town of Frisco ["the Town"];

Second Claim for Relief for False Imprisonment against Minor, Woodman, Osborn, the Board, Wickman, Heminghous and the Town;

Fifth Claim for Relief for Invasion of Privacy against Minor, Woodman, Osborn, the Board, Wickman, Heminghous and the Town;

Sixth Claim for Relief for Defamation against Minor, Woodman, the Board, Wickman and the Town;

---

[10]   The date of the incident in the letter was wrong.

Seventh Claim for Relief for Intentional Infliction of Emotional Distress;

Eighth Claim for Relief for Extreme and Outrageous Conduct against Minor,

Woodman, Osborn, the Board, Wickman, Heminghous and the Town; and

Ninth Claim for Relief for Vicarious Liability against Minor, Woodman, Osborn,

the Board, Wickman, Heminghous and the Town.

IV.   ANALYSIS

    A.   Federal Claims

        1.   Individual Defendants

            a.   Standard on Qualified Immunity

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that

government officials performing discretionary functions are shielded from liability for

civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person should have known.  *Harlow* places a

presumption in favor of immunity of public officials acting in their individual capacities.

*Schalk v. Gallemore*, 906 F.2d 491 (10th Cir. 1990).  Once the defense is raised by a

defendant, the burden shifts to the plaintiff to come forward with facts or allegations

sufficient to show both "that the defendant's actions violated a constitutional or

statutory right'" and that the right "was clearly established at the time of the defendant's

unlawful conduct".  *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quoting

*Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)).

Ordinarily, in order for the law to be clearly established, there must be a

Supreme Court or Tenth Circuit decision on point, or the clearly established weight of

authority from other courts must have found the law to be as the plaintiff maintains."

*Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).  The test

is one of objective reasonableness in light of the law at the time of the alleged violation.

*Jantz v. Muci*, 976 F.2d 623, 627 (10th Cir. 1992), *cert. denied*, 508 U.S. 952 (1993).

A plaintiff cannot defeat a defense of qualified immunity merely by alleging a

violation of "extremely abstract rights."  *Anderson v. Creighton*, 483 U.S. 635, 639

(1987).  Rather, "the right the official is alleged to have violated must have been 'clearly

established' in a more particularized sense."  *Id.* at 640; *see also Brosseau v. Haugen*,

543 U.S. 194, 198 (2004) (whether the law was clearly established "'must be

undertaken in light of the specific context of the case, not as a broad general

proposition'") (quotation omitted).  In other words, "[t]he contours of the right must be

sufficiently clear that a reasonable official would understand that what he is doing

violates that right.'"  *Snell v. Tunnell*, 920 F.2d 673, 696 (10th Cir. 1990) (quotation

omitted).  This requires "some, but not necessarily precise, factual correspondence"

between cases predating the alleged violation and the facts in question in this case.

*Calhoun v. Gaines*, 982 F.2d 1470, 1475 (10th Cir. 1992).

The burden is on the plaintiff to show that the law was clearly established at the

time of the alleged violation.  *Dixon v. Richer*, 922 F.2d 1456, 1460 (10th Cir. 1991).  If

the law is clearly established, the question becomes whether the defendant's conduct

was objectively reasonable in light of the clearly established law.  *Breidenbach v.*

*Bolish*, 126 F.3d 1288, 1291 (10th Cir. 1997).  There must be "some, but not

necessarily precise, factual correspondence" between cases predating the alleged

violation and the facts in question in this case.  *Calhoun v. Gaines*, 982 F.2d 1470,

1475 (10th Cir. 1992).  The Supreme Court has stated that where the case law relied

on by the plaintiff depended heavily on the facts, none of them squarely governed the

situation at hand, and the cases suggested that the actions at issue fell in the 'hazy

border between legal and illegal conduct, the cases did not clearly establish that the

defendant's conduct violated the Constitution.  *Brosseau*, 549 U.S. at 201.

> b.      Claims Related to Search Warrant

The search of Plaintiffs' condominium took place pursuant to a warrant.

Plaintiffs, however, challenge the validity of the warrant, asserting that there was not

sufficient probable cause for issuance of the warrant.  As part of that allegation,

Plaintiffs allege that the affidavit in support of the warrant was either false or

misleading.  It appears from the facts that Osborn and Heminghous were the

Defendants directly involved in obtaining the search warrant.  However, my findings on

this issue are equally applicable to all Defendants.

The law recognizes a strong preference for warrants, and a search conducted

pursuant to a warrant is presumptively valid.  *United States v. Leon*, 468 U.S. 897

(1984).  Further, an affidavit in support of a search warrant is treated as presumptively

valid.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  A search warrant may issue

upon application evidencing probable cause for a requested search.  *Leeper v. United

States*, 446 F.2d 281, 285-86 (10th Cir. 1971), *cert. denied*, 404 U.S. 1021 (1972).

Probable cause is measured by a "totality of the circumstances" standard under

which the magistrate judge makes a "practical, common sense decision whether, given

-22-

all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Corral*, 970 F.2d 719, 727 (10th Cir. 1992) (quotation omitted). All that is required to support a finding of probable cause is that enough information beyond the mere conclusions of the affiant be presented to enable the magistrate to make the judgment that the charges are not capricious and are sufficiently supported to justify additional steps in the criminal process. *Id.*

The court must thus determine whether the "totality of the information contained in the affidavit provided a substantial basis for finding there was a fair probability that evidence of criminal activity would be found" at Plaintiffs' residence. *United States v. Hager*, 969 F. 2d 883, 887 (10th Cir.), *cert. denied*, 506 U.S. 964 (1992). The burden of overcoming the presumption of regularity associated with a search pursuant to a warrant rests with the party seeking relief. *United States v. Peveto*, 881 F.2d 844, 850-51 (10th Cir.), *cert. denied*, 493 U.S. 943 (1989). The issuing judge's determination of probable cause is to be given "great deference" by a reviewing court and the review should not take the form of a de novo review. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) Moreover, warrants should not be invalidated by interpreting supporting affidavits in a hypertechnical, rather than common sense, manner. *Id.*

To impeach an otherwise valid warrant on grounds that it was issued on information that was false requires proof that the affiant seeking the warrant knew that the challenged information was false or was made by the officer with a reckless

disregard for its truthfulness. *Beard v. City of Northglenn*, 24 F.3d 110, 114 (10th Cir.

1994). Allegations of negligence or an innocent mistake in preparing the affidavit are

insufficient. *Id.* Recklessness may be inferred from circumstances evidencing "obvious

reasons to doubt the voracity of the allegations." *Id.* at 116. Officers are not required

to exhaust "every possible lead, interview all potential witnesses, and accumulate

overwhelming corroborative evidence to satisfy the reckless disregard test." *Id.* Failure

to do these things is generally considered to be simple negligence "at most". *Id.*

Even where a false statement is made, such false statement must be material

such that if, after setting aside such false statement, there remains insufficient content

to support a finding of probable cause. *Franks*, 438 U.S. at 171. The burden is on the

party challenging the validity of the warrant to demonstrate falsity or reckless disregard

for the truth. *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *United

States v. Knapp*, 1 F.3d 1026, 1028 (10th Cir. 1993).

I will begin with the issue of whether the affidavit contained sufficient probable

cause for the issuance of the warrant. As noted above, I must give deference to the

issuing judge. Based on the undisputed facts in this case, I find that there was

probable cause for the issuance of the underlying warrant.

More specifically, the Tubbs told police that they had smelled noxious chemical

odors emanating from Plaintiffs' unit for several months. The Tubbs stated that they

had noticed these odors on ten separate occasions, always during the early morning

hours, while Plaintiffs were up and making noise. On four occasions, the Tubbs

telephoned police with these complaints. On the first three occasions, according to the

Tubbs, by the time the police had arrived, the odors had dissipated.  On July 25, 2004,

however, while the two responding officers did not smell the odor in the Tubbs' unit,

they did sense a burning sensation in their throats and one of them felt light- headed.

The Tubbs told the officers that the Plaintiffs seemed to have had a change in

behavior, avoiding David Tubbs, and that they would not "look you in the eye".  They

also described people staying at Plaintiffs' unit and trips back and forth to the garage.

Colvin testified that he found the Tubbs to be credible.  This corroboration prompted

Colvin and Baker to contact Osborn and Heminghous, who were experienced narcotics

officers.  As Osborn and Heminghous approached the unit, they both caught a brief

whiff of a chemical odor consistent with methamphetamine.  Osborn and Heminghous

then interviewed the Tubbs and got the same information that had been provided to

Colvin and Ruszczyk.  I find the totality of the information available to the Defendants,

including Osborn and Heminghous, supports the finding of probable cause.

Plaintiffs also argue that the officers did not corroborate the information given by

David Tubbs.  However, reliance on witnesses is proper and may be used to satisfy the

probable cause standard unless there is some reason for the police to believe that the

information was not reasonably trustworthy.  *See Romero v. Fay*, 45 F.3d 1472, 1476

(10th Cir. 1995).  Here, the police had an opportunity to assess David Tubbs'

credibility.  This was not an unidentified tipster, but someone who the officers

interviewed and who had first hand knowledge about the Plaintiffs' unit and activity

going on there.  There is no evidence to suggest that the police had any reason to

believe that Tubbs' information was not reasonably trustworthy.

Plaintiffs also contend that the officers should have done more investigation before seeking a warrant.  Plaintiffs contend that the officers should have staked out the complex, canvassed the area, checked the trash and/or pulled water utility bills. While these steps may have provided more information to the officers, none of them were necessary for probable cause nor is the lack of additional investigation evidence of recklessness.  *See Beard*, 24 F.3d at 116.  Further, once probable cause exists, the police are not required to go in search of exculpatory evidence.  *Id*. at 1477-78.

It is also argued that the officers left out potentially exculpatory evidence from the affidavit.  Specifically, it is argued that the affidavit is missing information about how officers did not find anything suspicious when they responded to the prior calls, including Sergeant White's visit.  I do not find this information to be exculpatory and it was therefore not a material omission.  This information might have been important, had the warrant been issued in the absence of any corroboration by law enforcement. However, the corroboration on July 25, 2004, makes the fact that the police had not previously detected the odors less important.  Further, there is no showing that if this evidence had been included in the affidavit, probable cause would have been negated.

There is evidence of some misstatements in the affidavit, the most significant being that Colvin is said to have told Osborn that both Colvin and Ruszczyk became "nauseated".  In fact, only Ruszczyk became "light-headed".  However, I find that neither this nor the other alleged misstatements in the affidavit were material to the finding of probable cause.  Moreover, there is no evidence that the misstatements were knowingly or recklessly put into the affidavit by Osborn.

Plaintiffs further point to the expert testimony of their police expert in an attempt to create a disputed issue of fact on probable cause.  I find that this legal opinion is not a proper subject of expert testimony as this is a legal determination to be made by this Court.  *See Estes v. Moore*, 993 F.2d 161, 163 (8th Cir. 1993).

I also note that Osborn conferred with District Attorney Romeo before submitting the affidavit to the court, and states that he relied on her statement that probable cause existed.  Hemminghous is also alleged to have relied on Romeo's statement.  Reliance on advice of counsel can provide an additional basis for qualified immunity.  *V-1 Oil Co. v. State of Wyoming*, 902 F.2d 1482, 1489 (10th Cir. 1990).  Plaintiffs challenge the information given to Romeo, noting that Romeo recalled in her deposition that Colvin and Ruszczyk smelled the odor and were nauseated and sick, when in reality, neither "smelled" the odor.  I do not find evidence of a knowing or reckless misstatement, or that Romeo's misapprehension was material, particularly since both officers had burning in their throats and one was lightheaded.  Further, it is undisputed that other officers smelled an odor outside the building.  Osborn and Hemminghous' reliance on advice of counsel thus provides an additional basis for qualified immunity.

Even if the search warrant was not supported by probable cause, there is a good faith exception to the exclusionary rule when the police rely on a facially valid warrant.  *United States v. Leon*, 468 U.S. 897 (1984).  *Leon* "'stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause.'"  *United States v. Robinson*, 336 F.3d 1293, 1295-96 (10th Cir.

2003) (quotation omitted).  Under this good faith exception, "suppression is necessary

'only if the officers were dishonest or reckless in preparing their affidavit or could not

have harbored an objectively reasonable belief in the existence of probable cause.'" *Id.*

at 1296. (quotation omitted).  Here, it appears that Defendants would, at the very least,

be able to rely on the good faith exception, and Plaintiffs have not shown through any

evidence that this exception is not applicable.

Finally and most importantly, I find that summary judgment is proper because

Plaintiffs have not cited clearly established law that Defendants violated.  Plaintiffs'

reliance upon *Bennett v. State*, 44 S.W. 3d 310 (Ark 2001); *Lowery v. State*, 843

S.W.2d 136 (Tex. App. 1992); and *People v. Cruse*, 58 P.3d 1114 (Colo. App. 2002) is

insufficient to establish clear law.  First, these cases are too factually distinct to

properly define the contours of the probable cause inquiry for the circumstances of this

case.[11]  Second, these cases fail to provide the weight of authority as required under

Tenth Circuit law.  Accordingly, I find that Defendants are entitled to qualified immunity

on the claims related to the search warrant affidavit.

---

[11]  For example, *Bennett* involved only an officer's one time smell of a chemical odor which he used to obtain a warrant.  The court held that the smell of a substance which could have been used for legal purposes, standing alone, did not support a probable cause finding.  *Bennett*, 44 S.W.3d at 314-15.  Here, in addition to the chemical smell detected outside the building, officers corroborated the complaints through physical sensations experienced when in the Tubbs unit, including irritation in their throats.  Further, the police had an eyewitness (Mr. Tubbs) that had reported he smelled the odor ten times and reported this odor to the police four times.  Tubbs had been observed to be credible by the police.  The witness also reported other suspicious activity on the part of Plaintiffs, including the fact that they stayed up to all hours of the night, that the odor usually occurred late at night when the Plaintiffs were up, and that when an officer went to knock on Plaintiffs' door one time, the witness heard toilets flushing and water running.  *Lowery* involved uncorroborated tips, unlike this case where the tips were provided by a reliable source who lived right above the Plaintiffs' unit.  *Lowery*, 843 S.W.2d at 142.  Further, in *Lowery*, a tip from an officer about the smell of a meth lab was not connected to the residence at issue or any particular location.  *Id.*  Here, the police had a reliable source attributing the smell of the odor to Plaintiffs' residence.

c.   Claims Related to the Search of the Unit

I will next consider the claims made concerning the actual execution of the search warrant.  The individual Defendants who were directly involved in execution of the warrant are Osborn and Heminghous.  Woodman was also involved insofar as he was the on-scene commander.  However, my analysis remains the same even if I assume that all Defendants were involved in the search of the unit.

A lawful entry pursuant to a search warrant may still violate Fourth Amendment where there is excessive or unnecessary destruction of property in the course of the search.  *United States v. Ramirez*, 523 U.S. 65, 71 (1998).  Reasonableness is the touchstone of this inquiry.  *Pennsylvania v. Mimms*, 434 U.S. 106, 108-109 (1977).  As long as an officer's conduct remains within the boundary of reasonableness, the officer has discretion over the details and how best to proceed with a warrant execution.  *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997).  Occasionally, such details include damaging property, detaining residents, or taking action necessary to protect officers.  *Id.*; *see also Dahlia v. United States*, 441 U.S. 238, 258 and n. 19 (1979).  The use of forceful breaking and entering may also be necessary to effectuate a warrant, even though the warrant gave no indication that force had been contemplated.  *Id.* at n. 19.  In other words, where public safety is a concern, a dynamic entry into the premises to be searched may be justified.  *See, e.g., Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1191 (10th Cir. 2001), *cert. denied*, 535 U.S. 1056 (2002).

The issue of whether an officer acted reasonably in the execution of a search warrant "is a highly fact-dependent inquiry", and the court must look to the totality of the

circumstances to determine whether the officer's conduct was reasonably necessary to effectuate the warrant's purpose. *Lawmaster*, 125 F.3d at 1349. In connection with a qualified immunity defense on this issue, the plaintiff in the summary judgment context "must present some evidence to support the allegations; mere allegations, without more, are insufficient to avoid summary judgment." *Id.*

Here the officers were searching for a suspected clandestine methamphetamine lab which can be very dangerous, and there is evidence that they were concerned about safety. Accordingly, I do not find that utilizing a SWAT team in protective gear to execute the search warrant was unreasonable. There is some evidence that doors were damaged and some property broken. However, I have reviewed the photographs, which are the best evidence of what occurred during the search. Plaintiffs' contention that their home was "ransacked" is not borne out by the evidence. It is noteworthy that the officers took detailed photographs of the interior of the unit and left word where reimbursement could be had. Thus, it appears that the conduct was reasonable, and Plaintiffs have presented no evidence that supports a contrary interpretation.

Most importantly, Plaintiffs have not cited any case law from this Circuit or the Supreme Court that suggests that this conduct was not reasonable and/or violated the Fourth Amendment or any clearly established law. Thus, I find that Defendants are also entitled to qualified immunity on this issue.

d.   <u>Claims Related to Plaintiffs' Detention</u>

I will next address Plaintiffs' claims regarding their detention. I note that the only individual Defendant who participated in Plaintiffs' detention is Woodman. The

undisputed facts are that Woodman directed Baker to detain Plaintiffs, to later remove them from their vehicle and finally to walk them back to their condominium.[12]

There are two significant cases which permit the detention of persons while a search warrant is executed on a residence, *Michigan v. Summers*, 452 U.S. 692 (1981) and *Muehler v. Mena*, 544 U.S. 93 (2005).  In *Summers*, the court upheld, during the execution of a search warrant, the detention of a man leaving the residence to be searched.  The court found that the existence of a warrant provided objective justification for the detention because a magistrate judge had determined that the police had probable cause to believe that someone in the residence was committing a crime.  *Summers*, 452 U.S. at 704.  The court found there were three reasons to support the detention of an occupant in such situations:  (1) preventing flight in the event incriminating evidence is found; (2) interest in minimizing the risk of harm to officers; and (3) accomplishing the orderly completion of a search.  *Id.* at 702-03.

In *Muehler*, the court held that the right to detain persons in a dwelling subject to a search warrant was "categorical".  *Muehler*, 544 U.S. at 98.  In that case, in the early morning hours, a SWAT team dressed in black broke into the plaintiffs' bedroom where a female was sleeping and placed her in handcuffs at gunpoint.  Police held her and three other individuals in a converted garage.  The court specifically sanctioned the holding of plaintiff in handcuffs during the two to three hour detention.  *Muehler*, 544 U.S. at 99-100.

---

[12]  Again, however, even if I were to assume that all the Defendants were somehow involved in the decision to detain Plaintiffs, the analysis remains the same.

Plaintiffs apparently allege conduct during their detention that did not involve Woodman but other officers who were not sued.  Specifically, Plaintiffs complain that officers cuffed them and engaged in accusatory questioning.  I would note that placing a person in handcuffs while they are detained during the execution of a warrant was sanctioned by *Muehler*, holding specifically that it was supported by the safety rationale since "the use of handcuffs minimizes the risk of harm to both officers and occupants". *Id.* at 100.  Accordingly, the decision to place the Plaintiffs in handcuffs while they were detained does not appear to be a violation of their rights.  Plaintiffs also generally complain about Detective White's questioning of Rhodes outside her condominium. The *Muehler* case sanctioned questioning during a detention pursuant to the execution of a warrant, and held that "mere police questioning does not constitute a seizure". *Id.* at 100-01.  While Plaintiffs allege that Detective White's questioning was accusatory and that Rhodes was hysterical, based on the record, Plaintiffs have cited no authority showing that Detective White's conduct violated their rights.

Pursuant to *Summers* and *Muehler*, I find that Woodman and the other Defendants did not violate Plaintiffs' Fourth Amendment rights by directing them to be detained and/or detaining them.  Further and more importantly, Plaintiffs have not identified any case law that shows Defendants violated their rights or clearly established law in connection with their detention.

Plaintiffs also challenge the fact that they were walked the three blocks back to their unit rather than being driven in a police car.  Plaintiffs contend that this was an effort to humiliate them, in violation of police policies and procedures.  The evidence

shows otherwise, as police were operating under the suspicion that Plaintiffs may have been involved in methamphetamine manufacturing, which can produce dangerous residues.  That risk provided a legitimate reason for not putting the Plaintiffs in a confined squad car.  Again, Plaintiffs have not shown through citation of any authority either their constitutional rights or any clearly established law were violated.[13]

For these reasons, the Court finds that Woodman and the other Defendants are shielded from qualified immunity with respect to Plaintiffs' detention.

e.    Supervisory Liability

I next address the claims made by Plaintiffs against Minor and Wickman, neither of whom was directly involved in the warrant or its execution.  Personal participation is an essential allegation in a § 1983 claim.  *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976).  Where as here, claims are made against a person acting in a supervisory capacity, a plaintiff must prove either personal direction or actual knowledge and acquiescence in the conduct alleged to have violated the constitutional rights of a citizen.  *Ruegsegger v. Jefferson County Board of County Commissioners*, 197 F. Supp. 2d 1247, 1264 (D. Colo. 2001).

For supervisory liability to apply in a § 1983 action, a plaintiff must demonstrate an affirmative link between the supervisor's conduct and the constitutional deprivation.

---

[13] I further that the detention and the conduct complained of in connection with same could be supported by the community caretaking function which allows police to detain people to promote public safety. *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993).  As the Tenth Circuit explained in *King*, the police have the right to exercise "community caretaking functions, totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute." *Id.*  "In the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the terms for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *Id.* at 1559.

A plaintiff may show an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise or control of direction or his failure to supervise. *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001). In other words, a plaintiff must show that a supervisory defendant expressly or otherwise, authorized, supervised, or participated in conduct which caused the constitutional deprivation. *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990). Ultimately, the supervisor's action or failure to act must amount to deliberate indifference to the rights of persons who will come into contact with a subordinate. *City of Canton v. Harris*, 489 U.S. 378 (1984); *see also Gates v. Unified School District Number 499*, 996 F.2d 1035, 1043 (10th Cir. 1993).

I previously found that Plaintiffs did not establish a constitutional violation and/or violation of clearly established law with respect to the warrant application or search and detention. Even if a violation had been shown, I find that Plaintiffs have not shown sufficient personal participation by the supervisory defendants sufficient to establish a claim against them. At most, Minor and Wickman were aware that their subordinates, who had considerable experience, were in the process of pursuing and executing a search warrant. There was no actual participation by Minor or Wickman in the events at issue and no evidence cited that would have put them on notice of actionable misconduct by their subordinates. Plaintiffs have also failed to cite evidence of a lack of training or supervision by Minor or Wickman. While Plaintiffs have attacked the credentials and training of some of the involved officers, including Osborn and Heminghous, the evidence presented by Defendants shows adequate training by each

officer sufficient to participate in narcotics investigations.  Plaintiffs have not shown to the contrary.

At oral argument, Plaintiffs asserted that Minor and Wickman are liable for the search and detention because of statements they made after the fact.  I believe that Plaintiffs are arguing that Minor or Wickman ratified the conduct of their officers. Plaintiffs have cited no authority that supports an argument that conduct after the fact is sufficient to make out a supervisory liability claim.  *See also Butler v. City of Norman*, 992 F.2d 1053, 1056 (10th Cir. 1993) (an isolated incident coupled with the failure to discipline is inadequate to support a finding of an affirmative link between the actions of the arresting officer and the chief of police).

Finally and most importantly, Plaintiffs have not cited to any authority which would satisfy their obligations under qualified immunity as to this issue.  Accordingly, I find that Plaintiffs have not met their burden and Minor and Wickman are entitled to qualified immunity in connection with supervisory liability claims.

2.   Entity Defendants

I already found that Plaintiffs failed to demonstrate a constitutional violation and/or a violation of clearly established law with respect to the search warrant and Plaintiffs' detention.  Even if Plaintiffs had much such a showing, Plaintiffs would also have to show an unconstitutional municipal custom or policy to prove a claim against the Town or the Board.  There are three ways that the existence of an unconstitutional custom or policy may be shown under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694-95 (1978): (1) where there is an express policy that causes the

constitutional deprivation; (2) where there is an allegation that the constitutional injury was caused by a person with final policy making authority; or (3) where there is a widespread, though not express, practice of deprivation that is so permanent and well settled as to constitute a "custom or usage" with the force of the law. *Kulikowski v. Bd. of County Com'rs*, 231 F. Supp. 2d 1053, 1062-63 (D. Colo. 2002); *see also City of Saint Louis v. Praprotnik*, 485 U.S. 112, 122-23 (1988).

Although Plaintiffs have complained in general about the Defendants' failure to adhere to some of their policies, there is no allegation that an express policy of either the Board or the Town caused Plaintiffs' injuries.

I next turn to the question of whether the conduct was caused by a final policymaker. Who is a "policymaker" is a question of state law, as a court must determine which official has final, unreviewable discretion to make a decision or take an action. *Praprotnik*, 485 U.S. at 124-127 (1988). Courts consider whether: (1) the official is meaningfully constrained by policies made by another; (2) the official's decisions are subject to meaningful review; and (3) the decisions are within the realm of the official's authority. *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995). Liability is imposed on a governmental entity only if a final policymaker ratifies the decision of a subordinate. The final policymaker must not only approve of the decision, but also adopt the basis for the decision and the ratification must be the moving force, or cause, of the alleged violation. *Praprotnik*, 485 U.S. at 127.

Here, the decisions with respect to obtaining and executing the warrant were made by Osborn, Heminghous and Woodman. No evidence has been submitted to

show that any of these three are final policymakers.  Plaintiffs also did not submit evidence which shows that Wickman and Minor are final policymakers.  Even if they are final policymakers, there is no evidence that they made a decision as a final policymaker since they played no role in the events.

Finally, no evidence has been presented of a widespread practice of deprivation similar to that which occurred under these facts.  Since Plaintiffs did not present evidence of a municipal custom or policy (or any official capacity claims), summary judgment on the § 1983 claims against the Board and the Town is appropriate.

### 3.   Section 1985(3) Claims

Plaintiffs also assert claims under 42 U.S.C. § 1985(3) against all of the Defendants.  The essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive Plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or depravation resulting therefrom. *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993).  Section 1985(3) does not "apply to all tortious conspiratorial interferences with the rights of others,' but rather, only to conspiracies motivated by 'some racial, or perhaps otherwise class-based invidiously discriminatory animus.'" *Id.* (citing *Griffin v. Breckenridge*, 403 U.S. 88 (1971)).  In this case, Plaintiffs failed to present any evidence or facts suggesting any class-based discriminatory bias.  Accordingly, summary judgment is proper on this claim.

### B.   State Claims

Plaintiffs have asserted numerous state law tort claims against Defendants. These include false imprisonment/false arrest, invasion of privacy, defamation, libel

and slander, intentional infliction of emotional distress, extreme and outrageous conduct, and vicarious liability/respondeat superior.[14]

### 1.   Claims Against the Entities

Any tort claims against the Town or the Board are barred by the Colorado Governmental Immunity Act ["CGIA"].  Colo. Rev. Stat. § 24-10-106(1) bars any claims which lie in tort or could lie in tort against a public entity, unless the claim falls within one of the seven enumerated waiver provisions.  The conduct asserted in this case does not fall within the waiver provisions, and the state law claims are barred as to the Board and the Town.

### 2.   Claim Against the Individuals

#### a.   False Imprisonment/False Arrest

The elements of a false imprisonment claim are: (1) that defendant intended to restrict a plaintiff's freedom of movement; (2) that plaintiff's freedom of movement was restricted for a period of time, however short, either directly or indirectly by an act of defendant; and (3) that plaintiff was aware that his freedom of movement was restricted.  *Goodboe v. Gabriella*, 663 P.2d 1051, 1055-6 (Colo. App. 1983).  A claim of false arrest requires that the plaintiffs show that they were taken into custody by one who did not have proper legal authority to do so.  *Enright v. Groves*, 560 P.2d 851, 853 (Colo. App. 1977).

---

[14]   The third, fourth and tenth claims for relief (for assault and battery, trespass and exemplary damages) were claims were dismissed at Plaintiffs' request by Order dated November 3, 2005.

"[A] claim for false arrest will not lie if an officer has a valid warrant or probable cause to believe that an offense has been committed and that the person who was arrested committed it." *Id.* Here, there was a legal justification for arresting and/or restricting Plaintiffs' freedom of movement, since the Defendants were executing a search warrant that I previously found was supported by probable cause. In connection with a search warrant, the Supreme Court held in *Muehler* that the suspects may be detained and even handcuffed and Plaintiffs have not cited any controlling authority from this Circuit or the Supreme Court to the contrary.

Further, Woodman is the Defendant alleged to have been involved in the decision to detain Plaintiffs. Since Woodman was not present to participate in the physical detention of Plaintiffs, the claim against him for false imprisonment/false arrest should fail for lack of personal participation. To the extent that Plaintiffs argue that Woodman is liable for directing Plaintiffs' detention, good faith and reasonableness are defenses to an action for false arrest or imprisonment. *Cooper v. Hollis*, 600 P.2d 109, 111 (Colo. App. 1979). Since it has not been shown that Woodman violated clearly established law in connection with Plaintiffs' detention, I find that Plaintiffs cannot establish a claim of false arrest/false imprisonment against Woodman. Further, Plaintiffs cannot show willful and wanton conduct on his part in directing their detention.

b.   Invasion of Privacy

Colorado recognizes three varieties of invasion of privacy claims: (1) appropriating one's name or likeness for another's benefit; (2) public disclosure of private facts, which concerns the communication or publication to third parties of

information or activities which a person has held private; and (3) intrusion upon seclusion, which focuses on the manner in which information that a person has kept private has been obtained. *Doe v. High-Tech Institute, Inc.*, 972 P.2d 1060, 1064-65 (Colo. App. 1998).

The facts do not establish a claim for appropriating one's name or likeness. Plaintiffs do not allege a plausible claim for intrusion on their seclusion, because such a claim requires that the intrusion be considered offensive by a reasonable person. Here, the officers who "intruded" were acting pursuant to a validly-issued search warrant. *Id.* at 1065. A claim for disclosure of private facts would also fail because it requires that a disclosed fact not be of a legitimate concern to the public. The only disclosure made were the comments in the newspapers, which Plaintiffs have conceded were matters of public concern. *Id.*

    c.    Defamation

Plaintiffs' defamation claims are asserted against Minor, Woodman and Wickman only. Defamation involves "a communication that holds an individual up to contempt or ridicule thereby causing him to incur injury or damage." *Lockett v. Garrett*, 1 P.3d 206, 210 (Colo. App. 1999). "Defamation which is oral is slander and that which is written is libel." *Walters v. Linhof*, 559 F. Supp. 1231, 1234 (D. Colo. 1983). A statement may be defamatory "if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Burns v. McGraw-Hill Broadcasting Co., Inc.*, 659 P.2d 1351, 1357 (Colo. 1983). The elements of a cause of action for defamation are: (1) a

defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement, irrespective of special damages or the existence of special damages to the plaintiff caused by the publication. *Walters*, 559 F. Supp. at 1234.

Plaintiffs have admitted for purposes of the summary judgment motions that they were private figures involved in a matter of public concern. Indeed, I agree with Plaintiffs that the higher standard of proof applies since they "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issue involved"". (quotation omitted). *Diversified Mgmt., Inc. v. The Denver Post, Inc.*, 653 P.2d 1103, 1105 (Colo. 1982). Accordingly, Plaintiffs have to prove actual malice, meaning they have to show that the Defendants knew that what they saying was false or made statements with reckless disregard as to whether they were false. *Walters*, 559 F. Supp. at 1235; *see also Diversified Mgmt.*, 653 P.2d at 1104-09. "A showing of reckless disregard requires sufficient evidence to demonstrate that the defendant in fact entertained serious doubts as to the truth of the published statement." *Lockett*, 1 P.3d at 210. Actual malice has to be proved by clear and convincing evidence. *Diversified Mgmt.*, 653 P.2d at 1104-09.

The truth is a complete defense to defamation. Absolute truth is not required; instead, a defendant need only show substantial truth, that is: the substance, the gist, the sting of the matter as true. *Gordon v. Boyles*, 99 P.3d 75, 81 (Colo. App. 2004). Although an individual has the right to be free from false and defamatory assertions, that right must be weighed against society's interest in encouraging and fostering

vigorous public debate.  Accordingly, a statement of opinion relating to matters of

public concern which does not contain a provably false accusation is protected by the

Constitution.  *Keohane v. Stewart*, 882 P.2d 1293, 1298-99 (Colo. 1994), *cert. denied*,

513 U.S. 1127 (1995).

Colorado courts have held that summary judgment is particularly appropriate in a

defamation case.  *DiLeo v. Koltnow*, 613 P.2d 318, 323 (Colo. 1980).  "Were not

summary judgment granted in proper cases, the threat of protracted litigation might

have a chilling effect upon the full and free exercise of the First Amendment right. . . ."

*Id.*  "[T]he party opposing summary judgment is not entitled to rely on the pleadings, but

must raise a genuine issue for trial based on specific evidentiary facts."  *Lewis v*

*McGraw-Hill Broadcasting Co.*, 832 P.2d 1118, 1124 (Colo. App. 1992).  Further, a

denial of the facts asserted in support of the summary judgment motion will not suffice

to raise a genuine issue of material fact.  *Id.*  Finally, "the sufficiency of plaintiffs'

evidence is to be evaluated by the clear and convincing standard."  *Id.*

In the case at hand, I first address the July 28, 2004 Radio Talk Show.  The only

evidence of the allegedly defamatory remarks made by Defendants Minor, Woodman

and Wickman is the description provided by the Plaintiffs in written discovery:

> They [the officers] continued to cast a cloak of suspicion on us, despite
> the lack of any evidence. [Sheriff] Minor said that they found 'less than a
> joint' of marijuana and that they could have arrested us for that.

This accounting of the allegedly defamatory statements by the identified

Defendants fails to articulate enough facts regarding the actual statement to make out

an actionable claim for slander.  Furthermore, with respect to the comment regarding

the finding of marijuana, it is undisputed that marijuana was in fact found in the searched premises.  Thus, truth is an absolute defense as pertains to this statement.

Moreover, Plaintiffs have come forward with no evidence suggestive of malice. In fact, the evidence shows the contrary.  All three Defendants testified or were quoted in the press as saying that they believed this to be a public safety issue that could not be ignored.  Plaintiffs have presented no evidence to the contrary.  For these reasons, the Court finds that Plaintiffs' defamation claim with respect to the July 28, 2004 radio talk show does not survive summary judgment.

I now address the July 27, 2004 Cover Story "Meth Raid Yields Nothing."  The cited newspaper article appears to be largely truthful and accurate.  The police did receive a number of tips regarding odors, odd behavior and suspicious activity in connection with the Plaintiff's unit.  Four of those tips were confirmed by sending officers to investigate.  Two officers suffered physical reactions and four officers verified the odor either by smell or physical reaction.  Police did test bags of clothing found in the garage and the tests were positive for hydrocarbons.  They also tested residue in the microwave oven found in the garage and that residue initially tested positive for hydrocarbons as well.  The police did in fact observe and document wiping streaks on the walls of the Plaintiffs' unit. These indicators were in fact found.

I find that the paraphrase about the police being "suspicious" and the quotes about getting "burned," paying "the price" and "believ[ing] there was probably a meth lab there" are constitutionally protected expressions of opinion regarding a matter of admitted public concern.  *Keohane*, 882 P.2d at 1298-99.  Moreover, they are not

sufficient to constitute slander because the context of the quote, as a whole, is not clearly defamatory since the identified Defendants also stated that they were apologetic and willing to pay for the damages.

Plaintiffs contend that certain statements in the news article are incorrect including the statement that two officers got "sick" and "ill" and four officers verified the odors. However, I find that the gist of this statement is true, which is all that is required under Colorado law. *See Gordon,* 99 P.3d at 81. Colvin and Ruszczyk experienced an irritation in the backs of their throats and Officer Ruszczyk became lightheaded after being in the unit above the Plaintiffs' on the night in question. Such reactions are akin to becoming sick or ill. Further, both Osborn and Heminghous reported detecting a slight chemical odor in the air as they approached the condominium complex on the night in question. Accordingly, officers did actually verify an odor.[15] Finally, the statements were made about an issue that Plaintiffs acknowledge to be a matter of public concern and about which they pursued media coverage. Plaintiffs were thus obligated to, but failed to come forward with, any evidence suggestive of actual malice.

Finally, I address the July 28, 2004 article "Police Pay for Damages,"[16] the August 3, 2004 article "Couple Awaiting Apology,"[17] and the October 6, 2004 article

---

[15] I further note that certain portions of the July 27, 2004 article were not disclosed in response to written discovery requesting identification of all defamatory statements. These purportedly defamatory statements were, however, raised in briefings. Under Fed.R.Civ.P. 37(e), a party who fails to disclose or supplement a disclosure may not use the evidence withheld at trial or in motions.

[16] "[Sheriff] Minor said Monday he would personally deliver the check and apologize to the couple – even though he remained suspicious because all the clues were there, but they weren't able to find any drugs or paraphernalia."

[17] "The Sheriff's Office is still waiting for test results taken from the scene, notably those in the garage where the officers said it smelled of flammable solution."

"Case Closed."[18]  Plaintiffs claim that these articles suffer from the same deficiencies as those just discussed.  I disagree.  The factual portions of the statements are essentially truthful and the remaining portions are either not defamatory or are constitutionally protected expressions of opinion regarding matters of public concern.  Further, there is no evidence, much less clear and convincing evidence, suggestive of actual malice.

In sum, this Court finds that Plaintiffs' defamation claims are barred by the defense of truth, by the fact that some allegations fail to articulate enough facts to determine the content of the allegedly defamatory statement, that other purportedly defamatory statements were mere expressions of opinion regarding a matter of public concern, and because Plaintiffs have failed to present any evidence suggestive of malice.  I further note that Plaintiffs have not shown any harm to their reputation or that third persons were deterred from associating or dealing with him.  Accordingly, I find that summary judgment is proper as to the defamation claims.

d.   <u>Intentional Infliction of Emotional Distress/Outrageous Conduct</u>

Under Colorado law, claims for intentional infliction of emotional distress and outrageous conduct are essentially the same claim.  To prove such a claim, Plaintiffs must show (1) that the Defendants engaged in extreme and outrageous conduct; (2) that the Defendants did so recklessly or with the intent of causing the Plaintiffs severe emotional distress; and (3) that Defendants' conduct caused Plaintiffs to suffer severe emotional distress.  *Culpepper v. Pearl Street Building, Inc.*, 877 P.2d 877, 882 (Colo.

---

[18] "That effectively closes our investigation on that case," Woodman said.  "We don't have the evidence to prosecute them."

-45-

1994).  Although the question of whether conduct is outrageous is generally one of fact

to be determined by a jury, it is the initial responsibility of a court to determine whether

reasonable persons could differ on the question.  *McCarty v. Kaiser-Hill Co., L.L.C.*, 15

P.3d 1122, 1126 (Colo. App. 2000).  Liability for outrageous conduct has been found

only when the conduct is so outrageous in character and to such an extreme degree as

to go beyond all possible bounds of decency, to be regarded as atrocious and utterly

intolerable in a civilized community.  *Coors Brewing Company v. Floyd*, 978 P.2d 663,

666 (Colo. 1999).

In the case at hand, I previously found that Plaintiffs did not show a violation of a

constitutional right and/or a violation of clearly established law in connection with any

of the events at issue in this case.  In other words, I found that the search warrant, the

execution of the search, the detention of Plaintiffs and the other activities complained of

by Defendant to be valid or, at the very least, not a violation of clearly established law.

For the same reasons discussed in connection with those actions, I also find no

conduct complained of by Plaintiff that rises to the level of outrageous conduct, and

grant summary judgment as to this claim.

e.    Vicarious Liability

It appears that Plaintiffs are asserting that the individual Defendants are liable

for the conduct of their subordinates.  It is unclear how such a claim is legally valid.

*See Flourney v. McComas*, 488 P.2d 1104, 1106 (Colo. 1971) (Colorado does not

generally recognize liability under a respondeat superior theory).  Nonetheless, since I

have found that summary judgment is proper as to the underlying conduct, any potential respondeat superior liability claims would also be barred.

f.  Individual Immunity Under State Law

Defendants Minor, Woodman and Osborne also assert individual immunity under Colo. Rev. Stat. § 24-10-118(2)(a) in claiming that their actions were not "willful and wanton."  In order to satisfy that standard, a plaintiff must show that a defendant purposefully pursued a cause of action, or inaction, that he considered would probably result in harm to a plaintiff.  *Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1141 (D. Colo. 2001) (summarizing Colorado law on this issue).  "Whether a plaintiff has pleaded sufficient facts to state a claim based upon willful and wanton conduct is to be determined by the court."  *Barham v. Scalia*, 928 P.2d 1381, 1385 (Colo. App. 1996).

For the reasons articulated throughout this Order, I find that Plaintiffs have failed to demonstrate such a "willful or wanton" conduct.  In fact, Plaintiffs did not even substantively respond to the Summit County Defendants' assertion of this immunity.  As a result, all of Plaintiffs tort claims against Defendants Minor, Woodman, and Osborn are also barred by Colo. Rev. Stat. § 24-10-118(2)(a).

V.  CONCLUSION

Based on the foregoing, it is ordered that Defendants' motions for summary judgment filed February 2, 2006, are **GRANTED**.  It is

FURTHER ORDERED that the Clerk enter Judgment for the Defendants, and award them costs as are allowable.  It is

FURTHER ORDERED that the trial set to commence June 4, 2007, and the final trial preparation conference set Friday, May 25, 2007, are **VACATED**.

Dated:  July 13, 2006

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge